**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JEWELTEX MANUFACTURING INC. RETIREMENT PLAN, On Behalf of Itself and All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | Case No. |
| vs. ) | JURY TRIAL DEMANDED |
| ) | CLASS ACTION |
| CALATLANTIC GROUP INC., SCOTT D. STOWELL, WILLIAM L. JEWS, LARRY T. NICHOLSON, BRUCE A. CHOATE, DOUGLAS C. JACOBS,  DAVID J. MATLIN, ROBERT E. MELLOR, NORMAN J. METCALFE, PETER SCHOELS, and CHARLOTTE ST. MARTIN, ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff Jeweltex Manufacturing Inc. Retirement Plan ("Plaintiff"), by and through its undersigned counsel, for its complaint against defendants, alleges upon personal knowledge with respect to itself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of the public stockholders of CalAtlantic Group, Inc. ("CalAtlantic" or the "Company") against CalAtlantic and the members of its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9,

arising out of their attempt to sell the Company to Lennar Corporation ("Lennar") and its wholly owned subsidiary Cheetah Cub Group Corp. ("Merger Sub") (the "Proposed Transaction").

2.     On October 30, 2017, the Company issued a press release announcing that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell CalAtlantic to Lennar.  CalAtlantic stockholders will have the right to receive either (i) 0.885 shares of Class A common stock of Lennar and 0.0177 shares of Class B common stock of Lennar,[1] or (ii) $48.26 in cash, without interest, per share of Company common stock, subject to proration such that CalAtlantic stockholders who elect to receive cash will receive in the aggregate no more than $1,162,250,000 in cash (the "Merger Consideration").  Current CalAtlantic stockholders would own approximately 26% of the combined company.  The Proposed Transaction is valued at approximately $9.3 billion.

3.     On November 22, 2017, Lennar filed an S-4 Registration Statement (the "Registration Statement") with the SEC.  The Registration Statement, which recommends that CalAtlantic stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan Securities LLC ("J.P. Morgan"); and (ii) Company insiders' and J.P. Morgan's potential conflicts of interest.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as CalAtlantic stockholders need such information in order to make a fully-informed voting decision in connection with the Proposed Transaction.

---

[1] The right to receive Lennar Class B common stock is the result of a stock dividend that Lennar distributed after the date of the Merger Agreement, which CalAtlantic stockholders will receive as though they had been Lennar stockholders on the record date for the stock dividend.

4.      In short, the Proposed Transaction is designed to unlawfully divest CalAtlantic's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.  To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the stockholder vote unless and until such problems are remedied.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 as well as under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  CalAtlantic is headquartered in this District. Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of CalAtlantic.

9.      Defendant CalAtlantic is a Delaware corporation with its principal executive offices located at 1100 Wilson Boulevard, #2100, Arlington, Virginia 22209.  CalAtlantic's common stock is traded on the New York Stock Exchange under the ticker symbol "CAA."

10.     Defendant Scott D. Stowell ("Stowell") has been a director of the Company since 2012 and Executive Chairman of the Board since 2015.  Prior to that, Defendant Stowell previously served as CalAtlantic's Chief Executive Officer ("CEO") from January 2012 and as President from 2011.  Defendant Stowell also served as the Company's Chief Operating Officer from May 2007 to March 2011 and in various other senior roles with CalAtlantic since 1996.

11.     Defendant William L. Jews ("Jews") has been Lead Independent Director of the Board and a director of the Company since 2015.

12.     Defendant Larry T. Nicholson ("Nicholson") has been President, CEO and a director of the Company since October 2015.

13.     Defendant Bruce A. Choate ("Choate") has been a director of the Company since 2007.

14.     Defendant Douglas C. Jacobs ("Jacobs") has been a director of the Company since 1998.

15.     Defendant David J. Matlin ("Matlin") has been a director of the Company since 2008.  Defendant Matlin has served as CEO of MatlinPatterson Global Advisors LLC ("MatlinPatterson"), a private equity firm that owns approximately 25.4% of CalAtlantic's outstanding shares through its affiliate MP CA Homes, LLC ("MP CA Homes"), since 2002 and is a MatlinPatterson designee to the Board.

16.     Defendant Robert E. Mellor ("Mellor") has been a director of the Company since 2015.

17.     Defendant Norman J. Metcalfe ("Metcalfe") has been a director of the Company since 2015.

18.     Defendant Peter Schoels ("Schoels") has been a director of the Company since 2009.  Defendant Schoels has served as the Managing Partner of MatlinPatterson since July 2002 and is a MatlinPatterson designee to the Board.

19.     Defendant Charlotte St. Martin ("St. Martin") has been a director of the Company since 2015.

20.     Defendants identified in paragraphs 10 - 19 are collectively referred to herein as the "Board" or the "Individual Defendants."

**OTHER RELEVANT ENTITIES**

21.     Lennar is a Delaware corporation with its principal offices located at 700 Northwest 107th Avenue, Miami, Florida 33172.

22.     Merger Sub, a wholly-owned subsidiary of Lennar, is a Delaware corporation formed for the purpose of being a party to the Merger Agreement.

**CLASS ACTION ALLEGATIONS**

23.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own CalAtlantic common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

25.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of November 15, 2017, there were 109,254,930 shares of Company common stock issued and outstanding.   All members of the Class may be identified from records maintained by CalAtlantic or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

26.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

27.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

29. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Company Background

30. Founded in 1965, CalAtlantic builds single-family attached and detached homes in the United States. The Company operates through two business segments: Homebuilding and Financial Services. As of August 13, 2017, CalAtlantic provided crafted homes from entry level to luxury in approximately 43 metropolitan statistical areas spanning 19 states. The Company also provides mortgage, title examination, and escrow services for homebuyers.

31. On April 27, 2017, CalAtlantic issued a press release announcing its first quarter 2017 financial results. CalAtlantic reported home sale revenues of $1.3 billion, up 13% from the fourth quarter of 2016, and net income of $82.6 million, or $0.62 per diluted share, compared to net income of $72.7 million, or $0.52 per diluted share for the fourth quarter of 2016. Defendant Nicholson was quoted as stating:

> I'm pleased with our strong start to the new year. Our first quarter results were solid, with net new orders up 4%, new home deliveries up 10%, and net income up 14%, to $0.62 per diluted share, as compared to the first quarter of 2016. We saw order growth accelerate through the quarter and we remain well positioned for a strong finish to the spring selling season.

32. On July 27, 2017, CalAtlantic issued a press release announcing its second quarter 2017 financial results. For the quarter, net new orders were up 4% from the second quarter of 2016, to 4,078 homes, with the dollar value of the orders up 7%. Commenting on the successful quarter, defendant Nicholson was quoted as stating:

> The second quarter was a productive one for the Company . . . . In addition to our solid operating results, I am pleased with the significant progress we made with our growth initiative, expanding into the robust Seattle and Salt Lake City

markets.  Our entry into these strong "top 20" markets offer us great growth and earnings opportunities going forward in sustainable, long-term markets.

**The Sale Process**

33.     On June 16, 2017, Lennar's financial advisor Citigroup, Inc. ("Citi") contacted defendant Matlin requesting a meeting.  At a June 20, 2017 meeting, Citi representatives asked defendant Matlin if he might be interested in meeting with senior management of Lennar.  At a meeting the next day, defendant Matlin informed Lennar management that MP CA Homes would be supportive of a combination of CalAtlantic and Lennar if the Board decided to pursue one, but any proposal was a matter to be discussed with and presented to the Board, not MP CA Homes, due to MP CA Homes' Stockholders Agreement with the Company.

34.     Following a June 21, 2017 meeting between Lennar President Rick Beckwitt ("Beckwitt"), Lennar CEO Stuart Miller ("Miller"), representatives of Citi and defendant Nicholson, on June 22, 2017, Beckwitt submitted a verbal proposal to enter into a business combination transaction with CalAtlantic in a primarily stock transaction at a purchase price of $39.50 per share.

35.     The Board determined Lennar's offer price was inadequate and Lennar submitted revised proposals, increasing its offer price to $44.00 per share on July 24, 2017.

36.     On July 25, 2017, the Board determined to engage financial and legal advisors to assist in evaluating Lennar's proposal and formed an advisory committee (the "Advisory Committee") consisting of defendants Jews, Metcalfe and Mellor.  CalAtlantic subsequently engaged J.P. Morgan on September 15, 2017.

37.     On August 19, 2017, the Advisory Committee determined it was in the best interests of CalAtlantic and its stockholders for CalAtlantic to continue to implement its own strategy.

38.     Following a review of Lennar's non-public management plan, on September 5, 2017, J.P. Morgan submitted CalAtlantic's counterproposal of $48.00 per share.   Lennar subsequently reiterated its $44.00 per share proposal and on September 9, 2017, the Board determined to submit a counterproposal at a fixed exchange ratio of 0.91 shares of CalAtlantic stockholders, rather than a nominal price, with an implied pro forma ownership for CalAtlantic stockholders of over 31.0%.

39.     On September 26, 2017, Beckwitt submitted a non-binding indication of interest proposing a business combination transaction at a 0.91 exchange ratio.   The next day, the Board determined to engage in negotiating a potential business transaction with Lennar based on its September 26 proposal.

40.     The parties discussed the open items of the merger agreement, including Lennar's October 22, 2017 proposal for one member of the Board to join the Lennar board of directors following consummation of the transaction.

41.     On October 23, 2017, Beckwitt indicated that due to recent changes in the price of Lennar Class A common stock relative to the price of CalAtlantic common stock, Lennar could no longer agree to a deal at an exchange ratio of 0.91 shares, but was instead prepared to agree to an exchange ratio of 0.87 shares.   On October 25, 2017, defendant Stowell and Beckwitt tentatively agreed to an exchange ratio of 0.885 shares of Lennar Class A common stock for each share of CalAtlantic common stock, subject to approval of their respective boards.

42.     The parties negotiated the remaining open items, including that MP CA Homes agree to backstop a cash election option at a discount of 6%, which defendant Matlin agreed to on October 28, 2017.

43.     On October 29, 2017, J.P. Morgan rendered its fairness opinion and the Board approved the Merger Agreement.

44.     Later that day, Lennar and CalAtlantic executed the Merger Agreement.

**The Proposed Transaction**

45.     On October 30, 2017, CalAtlantic and Lennar issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

MIAMI, Fla. and ARLINGTON, Va., Oct. 30, 2017 /PRNewswire/ --

- Top 3 position in 24 of the 30 largest MSAs

- Combined revenue in excess of $17 billion and equity market capitalization of $18 billion

- Expect to realize $75 million and $250 million in synergies in FY 2018 and FY 2019, respectively

- Consideration is approximately 80% stock and 20% cash

Lennar Corporation (NYSE: LEN and LEN.B) and CalAtlantic Group, Inc. (NYSE: CAA) today announced that their respective boards of directors have unanimously approved a definitive merger agreement pursuant to which each share of CalAtlantic stock will be exchanged for 0.885 shares of Lennar Class A common stock in a transaction valued at approximately $9.3 billion, including $3.6 billion of net debt assumed.

The business combination will create the nation's largest homebuilder with the last twelve months of revenues in excess of $17 billion and equity market capitalization, based on current market prices, of approximately $18 billion. The combined company will control approximately 240,000 homesites and will have approximately 1,300 active communities in 49 markets across 21 states, where approximately 50% of the U.S. population currently lives.

It is currently anticipated that the transaction will generate annual cost savings and synergies of approximately $250 million, with approximately $75 million achieved in fiscal year 2018. These synergies are expected to be achieved through direct cost savings, reduced overhead costs and the elimination of duplicate public company expenses. Additional savings are also expected through production efficiencies, technology initiatives, and the roll out of Lennar's digital marketing and dynamic pricing programs.

Under the terms of the merger agreement, each share of CalAtlantic stock will be converted into the right to receive 0.885 shares of Lennar Class A common stock. Based on the closing price of Lennar's Class A common stock on the NYSE on October 27, 2017, the implied value of the stock consideration is $51.34 per share, representing a 27% premium to CalAtlantic's closing price that same day. CalAtlantic's stockholders will also have the option to elect to exchange all or a portion of their shares for cash in the amount of $48.26 per share, subject to a maximum cash amount of approximately $1.2 billion.  CalAtlantic stockholders will receive Lennar stock unless they exercise an option to receive cash.  On a pro forma basis, CalAtlantic stockholders are expected to own approximately 26% of the combined company. The transaction is expected to close in the first calendar quarter of 2018.

Stuart Miller, Chief Executive Officer of Lennar, said, "This combination is first and foremost to enhance shareholder value. The transaction is accretive before deal costs in fiscal year 2018 and significantly accretive in fiscal year 2019.  The combined company will have a strong balance sheet and generate significant cash flow available to pay down debt and repurchase shares, which will improve returns on capital and equity."

Mr. Miller continued, "This combination increases our scale in the markets that we already know and in the products we already offer to entry level, move up and active adult customers. As a result, the combined company will have a top 3 ranking in 24 of the top 30 markets in the country."

"Accordingly, our overall company size and local critical mass will yield significant benefits through efficiencies in purchasing, access to land, labor and overhead allocation to a greater number of deliveries. The combined land portfolio will position the company for strong profitability for years to come, as we continue to benefit from a solid homebuilding market, supported by job and wage growth, consumer confidence, low levels of inventory, and a production deficit."

Larry Nicholson, President and Chief Executive Officer of CalAtlantic, said, "Our combination with Lennar underscores the quality and attractiveness of the CalAtlantic brand and people, and the business our talented team has worked hard to build.  Lennar is a well-respected name in the homebuilding industry and their team shares a deep commitment to innovation, quality, integrity and a focus on a superior customer experience."

Rick Beckwitt, President of Lennar, said, "We have great respect for what Scott Stowell, Larry Nicholson and the CalAtlantic team have accomplished, building upon the rich legacies of Standard Pacific and Ryland.  Our discussions over the last several months have only reinforced our conviction that by joining forces, we will achieve new heights in our industry and create significant value for all of our shareholders.  We share common cultures and deep traditions of delivering quality

and value, doing the right thing and exceeding the expectations of our customers. We look forward to executing our strategy as a larger and even stronger company and welcoming a very talented group of CalAtlantic associates to the Lennar family."

The transaction is subject to approval by Lennar and CalAtlantic stockholders. Stuart Miller and the Miller Family Trusts have agreed to vote their 41.4% voting interest in Lennar in favor of the merger. MP CA Homes LLC, an affiliate of MatlinPatterson Global Opportunities Partners III L.P., has agreed to vote its 25.4% voting interest in CalAtlantic in favor of the merger. Additionally, MP CA Homes has agreed to exercise the cash election for at least the number of shares to cause the maximum cash consideration amount to be fully subscribed by electing stockholders. Any cash election by MP CA Homes will be subject to proration into shares of Lennar Class A common stock, along with all other stockholders of CalAtlantic, who elect cash, if the number of cash elections by CalAtlantic stockholders exceeds the maximum cash amount. Upon completion of the transaction, Mr. Stowell, CalAtlantic's Executive Chairman, will join the Lennar Board of Directors.

### Insiders' Interests in the Proposed Transaction

46.     Lennar and CalAtlantic insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of CalAtlantic.

47.     Notably, according to the Registration Statement, defendant Stowell will join the board of directors of the combined company following consummation of the Proposed Transaction.

48.     Moreover, certain Company insiders stand to reap a substantial financial windfall for securing the deal with Lennar. For example, defendant Stowell, CalAtlantic Executive Vice President and Chief Financial Officer Jeff J. McCall ("McCall"), CalAtlantic Executive Vice President and Chief Marketing Officer Wendy L. Marlett ("Marlett"), and CalAtlantic Executive Vice President, General Counsel and Secretary John P. Babel ("Babel") entered into retention letter agreements with the Company concurrently with the execution of the Merger Agreement

(the "Retention Agreements"). The Retention Agreements provide that the executives will receive lump sum cash retention bonuses upon consummation of the Proposed Transaction so long as the executive remains employed with CalAtlantic or is terminated without "cause" at the request of Lennar, as follows: defendant Stowell: $8,250,000; McCall: $3,050,000; Marlett: $2,000,000; and Babel: $2,250,000.  The payments under the Retention Agreements are in addition to, and not in lieu of, other payments due and payable under CalAtlantic's employee benefit plans and/or any other agreements between the executives and the Company.

49.     Further, if they are terminated in connection with the Proposed Transaction, CalAtlantic's executive officers stand to receive substantial cash severance payments in the form of golden parachute compensation, as set forth in the following table:

| Name | Cash(1) | Equity(2) | Pension/NQDC(3) | Perquisites/Benefits(4) | Total |
|---|---|---|---|---|---|
| Larry T. Nicholson | 19,975,819 | 15,726,906 | — | 1,160,663 | 36,863,388 |
| Scott D. Stowell | 19,880,137 | 12,757,013 | — | 52,893 | 32,690,043 |
| Peter G. Skelly | 7,493,987 | 5,502,953 | — | 1,057,681 | 14,054,621 |
| Jeff J. McCall | 6,676,712 | 4,858,449 | — | 99,515 | 11,634,676 |
| Wendy L. Marlett | 4,476,027 | 2,224,365 | — | 66,217 | 6,766,609 |

## The Registration Statement Contains Material Misstatements or Omissions

50.     The defendants filed a materially incomplete and misleading Registration Statement with the SEC and disseminated it to CalAtlantic's stockholders.  The Registration Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting decision in connection with the Proposed Transaction.

51.     Specifically, as set forth below, the Registration Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan; and (ii) Company insiders' and J.P. Morgan's potential conflicts of interest.

**Material Omissions Concerning J.P. Morgan's Financial Analyses**

52.     The Registration Statement describes J.P. Morgan's fairness opinion and the various valuation analyses performed in support of its opinion.  However, the description of J.P. Morgan's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, CalAtlantic's public stockholders will be unable to determine what weight, if any, to place on J.P. Morgan's fairness opinion in determining whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to CalAtlantic's stockholders.

53.     For example, the Registration Statement sets forth:

In arriving at its opinions, J.P. Morgan, among other things:

* * *

- reviewed estimates of amounts and timing of the cost savings and related expenses and synergies expected to result from the proposed Merger, which we refer to as the "Synergies," as provided by the management of CalAtlantic based on their discussions with the management of Lennar. . . .

Registration Statement at 53.  However, the Registration Statement fails to disclose any of the Synergies provided by CalAtlantic management and relied upon by J.P. Morgan for its analyses.

54.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose: (i) the line items underlying the unlevered free cash flows for both CalAtlantic and Lennar utilized by J.P. Morgan in its analysis; (ii) the terminal year projections or estimates for both CalAtlantic and Lennar, reviewed and approved by CalAtlantic management and relied upon by J.P. Morgan in its analysis; (iii) the actual inputs and assumptions underlying the discount rate range of 7.75% to 8.75% selected by J.P. Morgan in the

analysis; (iv) the basis for selecting the perpetuity growth rate range of 0.5% to 1.5% used in the analysis; and (v) the terminal exit multiples implied from the analysis.

55.     With respect to J.P. Morgan's *Public Trading Multiples Analysis*, the Registration Statement fails to disclose the individual multiples and financial metrics for the companies observed by J.P. Morgan in the analysis.   A fair summary of such an analysis requires the disclosure of the individual multiples for each company utilized or, at a minimum, the high, low, mean and median multiples.

56.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.   Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

57.     The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Opinion of CalAtlantic's Financial Advisor;" and (ii) "Unaudited Prospective Financial Information."

***Material Omissions Concerning Company Insiders' and J.P. Morgan's Potential Conflicts of Interest***

58.     Further, the Registration Statement fails to disclose material information concerning the potential conflicts of interest faced by CalAtlantic insiders and J.P. Morgan in acting as the Company's financial advisor.

59. The Registration Statement provides that defendant Stowell will continue as a director of the Lennar board after completion of the Proposed Transaction. However, the Registration Statement fails to disclose the details of any employment related discussions and negotiations that occurred between Lennar and CalAtlantic executive officers, including who participated in all such communications, when they occurred, and their content. The Registration Statement further fails to disclose whether any of Lennar's prior proposals or indications of interest mentioned management retention.

60. Similarly, the Registration Statement fails to disclose any information concerning the negotiation of the Retention Agreements.

61. Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

62. Additionally, the Registration Statement provides that "J.P. Morgan may also receive an additional incentive fee which will be determined based on the consideration at closing and is contingent and payable upon the consummation of the proposed Merger." Registration Statement at 57. However, the Registration Statement fails to disclose under what circumstances this "incentive fee" may be paid, as well as the maximum amount of this incentive fee.

63.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

64.     The omission of this information renders the statements in the "Background to the Merger" and "Opinion of CalAtlantic's Financial Advisor" sections of the Registration Statement false and/or materially misleading in contravention of the Exchange Act.

65.     The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Registration Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

66.     Plaintiff repeats all previous allegations as if set forth in full.

67.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

68.     During the relevant period, defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

69.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Registration Statement.  The Registration Statement was prepared, reviewed, and/or disseminated by the defendants.  The Registration Statement misrepresented and/or omitted material facts, including material information about the financial analyses performed by the Company's financial advisor, and potential conflicts of interest.  The defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

70.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to stockholders.

71.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

72.     Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Class Claims Against the Individual Defendants for
Violation of Section 20(a) of the Exchange Act**

73.     Plaintiff repeats all previous allegations as if set forth in full.

74.     The Individual Defendants acted as controlling persons of CalAtlantic within the
meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as
officers or directors of CalAtlantic and participation in or awareness of the Company's
operations or intimate knowledge of the false statements contained in the Registration Statement
filed with the SEC, they had the power to influence and control and did influence and control,
directly or indirectly, the decision-making of the Company, including the content and
dissemination of the various statements which Plaintiff contends are false and misleading.

75.     Each of the Individual Defendants was provided with or had unlimited access to
copies of the Registration Statement and other statements alleged by Plaintiff to be misleading
prior to or shortly after these statements were issued and had the ability to prevent the issuance
of the statements or cause the statements to be corrected.

76.     In particular, each of the Individual Defendants had direct and supervisory
involvement in the day-to-day operations of the Company, and, therefore, is presumed to have
had the power to control or influence the particular transactions giving rise to the securities
violations as alleged herein, and exercised the same.  The Registration Statement at issue
contains the unanimous recommendation of each of the Individual Defendants to approve the
Proposed Transaction.  They were, thus, directly involved in the making of this document.

77.     In addition, as the Registration Statement sets forth at length, and as described
herein, the Individual Defendants were each involved in negotiating, reviewing, and approving
the Proposed Transaction.  The Registration Statement purports to describe the various issues

and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

78.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

79.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in its favor on behalf of CalAtlantic, and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to CalAtlantic stockholders;

C.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: December 11, 2017

/s/ Elizabeth K. Tripodi
ELIZABETH K. TRIPODI (VSB #73483)
LEVI & KORSINSKY, LLP
1101 30th St. NW, Suite 115
Washington, D.C. 20007
Telephone:    (202) 524-4290
Facsimile:    (202) 333-2121
etripodi@zlk.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
Alexandra E. Eisig
1500 Broadway, 16th Floor
New York, New York 10036